Shearing, J.,
dissenting:
I do not agree that the Attorney General, the Assistant Attorney General or the special counsel hired by the Nevada Commission on Judicial Discipline should be disqualified from appearing in this proceeding or any disciplinary proceeding now pending before the Commission. The grounds which the majority and the concurrence allege require the disqualification of the Attorney General are (1) violation of the separation of powers doctrine, (2) conflicts of interest and (3) misconduct amounting to violation of due process. None of these grounds is supported in law or fact.

SEPARATION OF POWERS

There is no basis in the Nevada Constitution, the Nevada statutes or the rules adopted by this court for holding that the Nevada Commission on Judicial Discipline lacks the authority to seek the assistance of the Attorney General’s office for legal advice and representation. On the contrary, the Commission is specifically authorized to do so. The legislature enacted NRS 1.450(2) directing the Attorney General to provide, upon request of the Judicial Discipline Commission, legal counsel in any investigation or proceeding of the Commission. The majority would have this statute declared unconstitutional in violation of the doctrine of separation of powers.
Article 3, Section 1 of the Constitution of the State of Nevada provides:
Three separate departments; separation of powers. The powers of the Government of the State of Nevada shall be divided into three separate departments, — the Legislative, — the Executive and the Judicial; and no persons *909 charged with the exercise of powers properly belonging to one of these departments shall exercise any functions, appertaining to either of the others, except in the cases herein expressly directed or permitted.
There is no dispute that Nevada has adopted the traditional separation of powers doctrine which provides the checks and balances necessary to prevent any one branch of government from becoming all-powerful and tyrannical. Each branch has the exclusive authority to exercise the powers delegated to it. Legislative power is the power to set the policies of the state through its enactments and the allocation of funds. See Galloway v. Trues-dell, 83 Nev. 13, 20, 422 P.2d 237, 242 (1967). Executive power is the power to enforce and implement the policies of the state as set forth by the legislature. Id. Judicial power is the power to interpret legislation, to hear and determine justiciable controversies and to enforce any valid judgment, decree or order. Id.
This does not mean that there is a wall between any of the branches preventing them from interacting. On the contrary, the structure of government is such that the branches must interact. That is what keeps any one branch from dominating the government. In The Federalist No. 47, responding to criticism that there was not sufficient separation of powers in the proposed federal constitution, James Madison stated:
If we look into the constitutions of the several States, we find that, notwithstanding the emphatical and, in some instances, the unqualified terms in which this axiom [separation of powers] has been laid down, there is not a single instance in which the several departments of power have been kept absolutely separate and distinct.
More recently, the United States Supreme Court has stated, in Morrison v. Olson, that
[T]he system of separated powers and checks and balances established in the Constitution was regarded by the Framers as “a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other.” We have not hesitated to invalidate provisions of law which violate this principle. On the other hand, we have never held that the Constitution requires that the three branches of Government “operate with absolute independence.” In the often-quoted words of Justice Jackson:
“While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable gov *910 ernment. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.”
487 U.S. 654, 693-94 (1988) (citations omitted).
And in Buckley v. Valeo, the United States Supreme Court stated:
[I]t is also clear from the provisions of the Constitution itself, and from the Federalist Papers, that the Constitution by no means contemplates total separation of each of these three essential branches of Government.... The men who met in Philadelphia in the summer of 1787 were practical statesmen, experienced in politics, who viewed the principle of separation of powers as a vital check against tyranny. But they likewise saw that a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively.
424 U.S. 1, 121 (1975) (per curiam).
Neither does the doctrine of separation of powers mean that the legislature or the constitution may not assign fact-finding functions in disputes to agencies in branches of government other than the judiciary. There are numerous state agencies which perform quasi-judicial functions, agencies such as the State Industrial Insurance System, the Board of Medical Examiners, Board of Parole Commissioners and Real Estate Commission, to name a few. The adjudicatory decisions made by these agencies affect the fundamental rights of individuals, and absent an appeal to the courts, are final, with the full force and effect of law. The majority states “A member of the executive branch is simply not constitutionally permitted to act in a judicial capacity.” Fortunately, the majority is wrong. If the majority’s implication that agency adjudication violates the separation of powers doctrine were correct, the overwhelming majority of government would be unconstitutional.
It has long been settled that the exercise of duties that are judicial in nature is not necessarily an exercise of the judicial power of the state and therefore does not violate the separation of powers doctrine. In Sawyer v. Dooley, 21 Nev. 390, 396, 32 P. 437, 439 (1893), this court stated regarding Article 1, Section 3 of the Nevada Constitution:
These departments are each charged by other parts of the constitution with certain duties and functions, and it is to these that the prohibition just quoted refers. For instance, the governor or the judiciary shall not be members of the legislature, nor shall they make the laws under which we *911 must live. But this is quite a different thing from saying that no member of the executive or judicial departments shall exercise powers in their nature legislative, but which are not particularly charged by the constitution upon the legislative department; such as where the board of commissioners for the insane makes rules for the management of the asylum, or a court establishes rules for the transaction of the business coming before it. It would be impossible to administer the state government were the officers not permitted and required, in many instances, to discharge duties in their nature judicial, in that they must exercise judgment and discretion in determining the facts concerning which they are called upon to act, and in construing the laws applicable to them. Hence we see no constitutional objection to members of the executive branch being charged with the duty of assessing property, or of acting upon the board of equalization, for neither of these functions have been, either expressly or impliedly, placed by the constitution upon either of the other departments; for certainly, although in equalizing valuations a board may act in a judicial capacity, the constitution nowhere contemplates that the judicial department, as organized by article 6, shall discharge that duty.
Thus, it is clear that not every exercise of a function judicial in nature constitutes an exercise of judicial power, which power the constitution states is not to be performed by other branches of government. In Bergman v. Kearney, 241 F. 884, 898 (D. Nev. 1917), the court stated: “Judicial power, in the constitutional sense, is something more than authority to hear and determine; it includes the power to decide finally and conclusively, and also power to carry its determination into effect.” This power does not rest in any agency or commission, unless the agency or commission or the party before it, agrees to accept the result with resort to the courts. The Nevada Constitution makes clear that the judicial power of this state rests exclusively in the courts. Article 6, Section 1 states:
Judicial power vested in court system. The Judicial power of this State shall be vested in a court system, comprising a Supreme Court, District Courts, and Justices of the Peace. The Legislature may also establish, as part of the system, Courts for municipal purposes only in incorporated cities and towns.
What is now Article 6, Section 21 of the Nevada Constitution, entitled Commission on Judicial Discipline, began as a proposed Constitutional amendment in the 1973 Legislature. Following the *912 procedure for constitutional amendment established by Article 16 of the Nevada Constitution, the elected representatives of the state voted in 1973 and again in 1975 in favor of the proposed amendment. Finally, in November of 1976 the amendment was ratified by direct vote of the people.
Prior to 1976 the people of Nevada had no effective remedy for judicial misconduct falling short of criminal behavior. The traditional checks and balances in our constitutional organization were not adequate to curb the abuses of power by members of the judicial branch. Judicial misconduct was, by and large, entirely beyond the jurisdiction of the executive branch, the legislative branch and all existing administrative agencies. Only the justices of the Supreme Court could impose discipline on judges of the state.
That the people of Nevada believed that the Supreme Court had not, and could not, effectively police judicial misconduct is not surprising. Judges and justices, following their constitutional mandate, hear and determine questions in controversy that are properly brought before them. See Galloway v. Truesdell, 83 Nev. 13, 20, 422 P.2d 237, 242 (1967). In carrying out their duties, judges, unlike legislators and especially unlike executive branch officials, do not ordinarily have occasion to investigate complaints of misconduct, much less to prosecute after determining that the complaints have merit. In striking down a statute which placed the judges in a position of investigator, this court warned, “Centuries of common law tradition warn us with echoing impressiveness that this is not a judge’s work.” 83 Nev. at 29, 422 P.2d at 248.
Furthermore, in a small state like Nevada, the justices and judges usually know one another personally. Thus, except in the case of the rare errant judge without strong personal ties of friendship with the judicial community, it was nearly psychologically impossible for the justices to adopt, on their own initiative, the role of investigator and prosecutor of judicial misconduct. The result was a dissatisfied public and the adoption of Article 6, Section 21 of the Nevada Constitution.
In adopting and ratifying Article 6, Section 21, the people of Nevada clearly intended to remove the power and responsibility for disciplining noncriminal judicial misconduct from the judiciary. In so doing, they clearly intended to leave the judiciary with less power and greater accountability. The one difference in the Nevada Commission on Judicial Discipline from most other agencies is that it was designed to have greater independence. The members are not selected by any one branch of government. The Governor appoints three members, the Supreme Court *913 appoints two members and the Board of Governors of the State Bar appoints two members. In addition, if the state bar ceases to exist as a public corporation, the legislature must determine how the attorney members are appointed.
In the Whitehead opinions issued thus far, the majority of this court argues that this could not have been the intent of the people because the provision creating the Judicial Discipline Commission was placed in Article 6 of the Nevada Constitution entitled “Judicial Department.” Therefore, according to the majority’s reasoning, because of the provision’s placement and because the Commission also has some “quasi-judicial” powers, the Commission must be a court exercising the judicial power vested in the court system by Article 6, Section 1.
This analysis does not survive a careful review of Article 6, which contains twenty-one sections ranging in title from “Judicial Power vested in court system” to “One form of civil action” to “Fees or perquisites of judicial officers.” First, when the voters added section 21 to the Constitution, Section 1 of Article 6, which vests the judicial power in the courts, was not amended to include the Judicial Discipline Commission in the list of courts authorized to exercise the judicial power of the state. This should be dispositive of the issue.
Furthermore, the contents of the other sections make clear that not all powers created in Article 6 relate to the exercise of judicial power. What the twenty-one sections have in common is that each section impacts in some way on the judicial branch of government. For example, Section 15 grants power to the legislature to fix the salaries of state judges and justices. It makes no more sense to state that the Judicial Discipline Commission is part of the judicial branch of government because it receives its powers from a section placed in Article 6 than it does to say that the legislature is part of the judicial branch of government because it too is the recipient of powers granted by a section of Article 6. Constitutional law does not depend upon principles of legislative indexing.
This court has recognized that the attorneys of this state are an integral part of Article 6. Such recognition is embodied in Supreme Court Rule 39, which provides:
Inherent powers of courts. Attorneys being court officers and essential aids in the administration of justice, the government of the legal profession is a judicial function. Authority to admit to practice and to discipline is inherent and exclusive in the courts. The supreme court rules set forth in this Part III are the exclusive rules for the governing of the legal profession in Nevada.
*914 Yet no one has suggested that because attorneys are officers of the court, they are part of the judicial branch and are therefore disqualified from representing or serving in the executive or legislative branches of government.
The judicial power, for constitutional purposes, can be found where it was placed by Article 6, Section 1 when the Nevada Constitution was ratified in 1864: in a “court system, comprising a Supreme Court, District Courts, and Justices of the Peace. . .
Justice Springer, in his concurring opinion, offers another reason why he believes that Article 6, Section 21 must be interpreted as placing the Judicial Discipline Commission in the judicial branch of government: if it were not so read, Article 6, Section 21 would violate the separation of powers clause, and thus, by implication, be unconstitutional. In support of this proposition, Justice Springer cites Dunphy v. Sheehan, 92 Nev. 259, 266, 549 P.2d 332, 336-37 (1976).
There are at least three problems with this analysis. First, it is an oxymoron to state that a duly-ratified constitutional amendment can, at the time of its passage, violate that same constitution. It is one of the best-established principles of constitutional interpretation that in the case of a clear conflict between a constitutional amendment and another constitutional provision already existing at the time the amendment is ratified, the amendment, being the later expression of will of the lawmaker, must prevail. Schick v. United States, 195 U.S. 65, 68-69 (1904). Thus, had the language of Section 21 placed the Judicial Discipline Commission entirely within the executive or legislative branch, neither Article 3, Section 1, nor any then-existing constitutional provision could be held to invalidate the new amendment.
Second, the court in Dunphy merely stated, in dicta no less, that the promulgation of a Code of Judicial Ethics, not the enforcement of such a code, is “within the inherent power of the judicial department of this state.” 92 Nev. at 266, 549 P.2d at 336-37 (1976). Since promulgation of the Code of Judicial Ethics remains today in the judicial branch of government, the decision is irrelevant regarding the creation of the Judicial Discipline Commission.
Finally, the Dunphy case was decided April 29, 1976, several months before Article 6, Section 21 was ratified in the November 1976 elections. Thus, even if Dunphy could be read to immunize the judiciary from judicial disciplinary proceedings from nonjudicial bodies, the case would have been explicitly overruled by the voters as of November 1976.
Justice Springer also seems to believe that there is an inconsistency between the view that the Commission does not exercise *915 the judicial powers of the State and the opinion in Goldman v. Nevada Comm’n on Judicial Discipline, 108 Nev. 251, 830 P.2d 107 (1992). There is no inconsistency whatsoever. The issue in Goldman was the scope of review, not whether judicial power rested in the Commission, and not whether the Commission was a “Court of Judicial Performance and Qualifications.” Goldman held that this court must accord Commission findings a deferential standard of review. This is no different than the deference this court must grant other state agencies by statute. See NRS 233B.135.[1] Additionally, there is no dispute that the Commission has broad power to discipline judges and that its orders are final unless appealed to this court. The same is true of most state agencies. Thus, Justice Springer’s discussion regarding Commissioners in other states and the fact that they only have power to make recommendations to the court rather than have final decision-making power is irrelevant to the instant case.
Specifically, Goldman does not support the sweeping proposition for which it is cited in Whitehead I that “the Commission is not to be regarded merely as an administrative agency but as a true ‘Court of Judicial Performance and Qualifications.’ ” Whitehead v. Comm’nonJud. Discipline, 110 Nev. 128, 161 n.25, 869 P.2d 795, 816 n.25 (1994). As stated, this court in Goldman merely held that the Judicial Discipline Commission is accorded the same deferential standard of review as any other state agency.
Since the Judicial Discipline Commission does not exercise the judicial power of the state, certainly the Commission’s attorney would not be exercising that power, even if providing legal advice could properly be equated with serving as an “ex facto member of the Commission.”
*916 Furthermore, it can be stated as a general rule that the attorney providing legal advice does not take on the character, for constitutional separation of powers purposes, of the client being served. That is why the legislature could, without violating the constitution, order the Attorney General to represent any and all government officers, officials, agencies and even judges and legislators. See NRS 41.0339. In all branches of government, decision makers, and not their legal advisors, take responsibility for the decisions they make. Contrary to the majority’s implication, there is nothing sinister about the Commission making decisions either consistent or inconsistent with the advice of an attorney from the Office of the Attorney General.

CONFLICTS OF INTEREST

The majority of this court also holds that the Attorney General is disqualified from representing the Commission because of conflicts of interest. The majority does not make clear under which constitutional provision it finds a conflict of interest which operates to nullify NRS 1.450(2). Some of the majority’s language suggests that the institutional position of the Attorney General is so rife with conflicts of interest with respect to the judicial branch of government that providing legal advice to the Commission violates the separation of powers clause. Other language suggests that in some way the petitioner’s due process rights will be violated if the Attorney General represents the Commission. Both contentions rest, not on any actual conflict of interest evidenced in the instant case, but on specters of potential conflicts and misuses of power, as well as criminal activity.
The general rule regarding conflicts of interests for attorneys is stated in Supreme Court Rule 157, which provides as follows:
Rule 157. Conflict of interest; General rule.
1. A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
(a) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
(b) Each client consents, preferably in writing, after consultation.
2. A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer’s responsibilities to another client or to a third person, or by the lawyer’s own interests, unless:
(a) The lawyer reasonably believes the representation will not be adversely affected; and
*917 (b) The client consents, preferably in writing, after consultation.
When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.
This rule would have some bearing on the majority’s allegation that there is a conflict arising from the fact that the Attorney General is official counsel for the judges and justices of the state. In the event that a judge involved in disciplinary proceedings were in need of legal services, it is quite possible that the Attorney General would not be able to form a reasonable belief that the representation would not be adversely affected, mandating disqualification under SCR 157. The solution to this conflict, which can hardly be characterized as one of constitutional dimension, is simple and straightforward. Under NRS 41.03435, the Attorney General would, with the approval of the State Board of Examiners, employ an attorney from the private sector to act as special counsel for the judge or justice.
Supreme Court Rule 157 does not apply to disqualify the Attorney General from providing legal advice to the Commission under any of the conflicts of interest alleged by the majority. Yet, despite the absence of a constitutional violation, the majority would nullify an act of the legislature directing the Attorney General to represent the Commission on the basis of hypothetical conflicts. This court has no general authority to strike down an act of the legislature merely because it sees potential or actual conflicts of interest. In State of Nevada v. Doron, 5 Nev. 399, (1870) this court stated:
[E]very statute is to be upheld, unless plainly and without reasonable doubt in conflict with the constitution; [and] the legislature has power to pass any law, not positively prohibited, or by clear implication forbidden by the constitution
Both Judge Guy in his concurrence in Whitehead I and the majority in this opinion rest their arguments on the assumption that Attorneys General will be unable to resist the temptation to engage in misconduct with respect to judges. The implication is that allowing NRS 1.450(2) to function as it has since it was enacted by the legislature in 1977 will inevitably lead to an epidemic of politically-motivated persecutions of judges. This fanciful scenario may be possible, but does not warrant legal action unless there is some actual evidence of its occurring. Government operates on the principle that its officers and employees are persons of good will and honesty who not only *918 follow the law, but their professional ethical obligations. We have been presented with no evidence that the executive officials have not been acting with professional integrity and ethics.
The majority view also ignores the very powerful disincentives to such conduct. An Attorney General or any attorney on the Attorney General’s staff who initiated a prosecution motivated by “personal, partisan or political gain,” or who attempted to hold a judge “hostage” to affect the outcome of a case, would be subject to prosecution under one or more of the following criminal statutes:
NRS 197.110 Misconduct of public officer — a gross misdemeanor
NRS 197.170 Extortion of public officer — a felony
NRS 197.200(2) (b) Oppression under color of office — a gross misdemeanor
NRS 199.300(2) Intimidating public officer, public employee, juror, referee, arbitrator, appraiser, assessor or similar person — a gross misdemeanor
NRS 199.310 Malicious prosecution — a felony or misdemeanor
NRS 199.320 Inducing lawsuit — a misdemeanor
NRS 200.510 Criminal libel — a gross misdemeanor
NRS 200.560 Threatening to public libel — a gross misdemeanor
NRS 205.320(4) & (5) Extortion-a felony
If criminal prosecution were not enough of a deterrent, the violator could also be charged with the violation of SCR 101, 174, 179, 181, 201 and 203, which, if found to be true, would almost certainly lead to disbarment under SCR 102. The law is well-equipped to deal with the extreme conduct that the majority seems to believe NRS 1.450(2) makes imminent.
The majority’s argument, however, suffers from a more serious defect than the fear being out of proportion to the danger. The argument contains no limiting principle. It could be said of every district attorney in Nevada that he or she has the power to bring about prosecution of judges, of legislators and of private citizens for political reasons or to influence decisions. In fact, all government officials with significant power, including judges and justices, are in a position to attempt to abuse that power if they are so inclined. That does not justify this court in prohibiting, as a prophylactic measure, an official from executing the functions assigned to it by law. On the contrary, even if there are public officials who have abused their powers, they could only be kept from their assigned duties after procedures which ensure that the officials have received due process of law.
*919 The majority would do well to heed the words of Justice Frankfurter in his concurrence in In Re Groban’s Petition, 352 U.S. 330, 335-37 (1957):
To whatever extent history may confirm Lord Acton’s dictum that power tends to corrupt, such a doctrine of fear can hardly serve as a test, under the Due Process Clause of the Fourteenth Amendment, of a particular exercise of a State’s legislative power. And so, the constitutionality of a particular statute, expressive of a State’s view of desirable policy for dealing with one of the rudimentary concerns of society — the prevention of fires and the ascertainment of their causes — and directed towards a particular situation, cannot be determined by deriving a troupe of hobgoblins from the assumption that such a particularized exercise of power would justify an unlimited, abusive exercise of power.
We are admonished from time to time not to adjudicate on the basis of fear of foreign totalitarianism. Equally so should we not be guided in the exercise of our reviewing power over legislation by fear of totalitarianism in our own country.
It is disingenuous for the majority to suggest that it is a conflict for the Attorney General to be privy to confidential information regarding judges and justices by virtue of representation of the Nevada Commission on Judicial Discipline while the Attorney General is not only free, but obligated, under NRS 41.0338, to represent judges in legal proceedings. The very same considerations apply in either scenario. When the Attorney General’s office represents judges and justices in litigation, the deputies assigned are also in a position to learn privileged and confidential information. The specter presented of judges held “hostage” and basically subjected to extortion or blackmail is possible, but the mere speculation that such could occur is no basis for disqualification. A judge is conceivably subject to being held “hostage” and subject to extortion or blackmail by anyone — an attorney, a litigant, a family member or a total stranger.
When similar arguments were raised in the federal courts against allowing the Attorney General to prosecute judges criminally, the Eleventh Circuit Court of Appeals replied as follows in United States v. Hastings, 681 F.2d 706, 710-11 (1982), cert. denied, 459 U.S. 1203 (1983):
[The judge] contends that the courts would be subject to intolerable pressure from the executive if executive officers were allowed to prosecute active federal judges for acts involving the exercise of their judicial power.
*920 Appellant is of course correct that the independence of the judiciary from external pressures is a highly valued element of our constitutional system. That independence is already protected by specific provisions in the Constitution. . . . Additionally, judges enjoy the same protection as do all citizens from vindictive prosecution by officers of the executive branch. We are not persuaded that the proposed rule of absolute judicial immunity from federal criminal prosecution is a necessary complement to the Constitution’s explicit protections. Indeed, the miniscule increment in judicial independence that might be derived from the proposed rule would be outweighed by the tremendous harm that the rule would cause to another treasured value of our constitutional system: no man in this country is so high that he is above the law.
(Citations and footnotes omitted.) In the instant case, the hypothetical potential for abuses must also give way to the competing interest of assuring effective means of preventing abuse of judicial power.
In addition, the alleged conflict between giving legal advice to the Commission and also acting as prosecutor before the Commission has long since been resolved by this court. In Laman v. Nevada R.E. Adv. Commission, 95 Nev. 50, 56-57, 589 P.2d 166, 170 (1979), this court stated:
Appellant contends that there was an improper commingling of judicial and prosecutorial functions during the Commission proceedings in that a Deputy Attorney General participated by advising the Commission on evidentiary matters, while his subordinate in the same office was engaged.in prosecuting appellant. This contention, unsupported by case authority, is adequately answered by this court’s ruling in Rudin v. Nevada Real Estate Advisory Commission, supra, 86 Nev. at 565, 471 P.2d at 660 [1970]:
It is not uncommon in administrative law to find the combination of investigating, prosecuting and judging functions. As a general proposition, such a combination, standing alone, does not constitute a denial of due process. 2 Davis, Administrative Law Treatise § 13.02. Such combination of functions possesses the potential for unfairness, but unfairness is not its inevitable consequence. In the matter at hand that combination did not exist. The investigation was conducted by investigators, the prosecution, by counsel for the Commission, and the decision was made by the Commission itself. There is nothing to suggest that the prosecutor decided the case.
*921 To the extent that federal due process is said to be implicated, even if we assume that the Attorney General performed the roles of investigator, prosecutor, legal advisor and even adjudicator in this case,[2] the United States Supreme Court has answered clearly. In Withrow v. Larkin, 421 U.S. 35, 47-53 (1975), the court stated:
The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.
Very similar claims have been squarely rejected in prior decisions of this Court.
More recently we have sustained against due process objection a system in which a Social Security examiner has responsibility for developing the facts and making a decision as to disability claims, and observed that the challenge to this combination of functions “assumes too much and would bring down too many procedures designed, and working well, for a governmental structure of great and growing complexity.” Richardson v. Perales, 402 U.S. 389, 410 (1971).
That is not to say that there is nothing to the argument that those who have investigated should not then adjudicate. The issue is substantial, it is not new, and legislators and others concerned with the operations of administrative agencies have given much attention to whether and to what extent distinctive administrative functions should be performed by the same persons. No single answer has been reached. Indeed, the growth, variety, and complexity of the administrative processes have made any one solution highly unlikely. Within the Federal Government itself, Congress has addressed the issue in several different ways, providing for varying degrees of separation from complete separation of functions to virtually none at all. For the generality of agencies, Congress has been content with § 5 of the Administrative Procedure Act, 5 U.S.C. § 554(d), which provides *922 that no employee engaged in investigating or prosecuting may also participate or advise in the adjudicating function, but which also expressly exempts from this prohibition “the agency or a member or members of the body comprising the agency.”
It is not surprising, therefore, to find that “[t]he case law, both federal and state, generally rejects the idea that the combination [of] judging [and] investigating functions is a denial of due process . . . .” 2 K. Davis, Administrative Law Treatise § 13.02, p. 175 (1958). Similarly, our cases, although they reflect the substance of the problem, offer no support for the bald proposition applied in this case by the District Court that agency members who participate in an investigation are disqualified from adjudicating. The incredible variety of administrative mechanisms in this country will not yield to any single organizing principle.
(Footnotes omitted.)
Because Withrow, like other United States Supreme Court precedent on federal due process, is controlling on the courts of all fifty states, it is not surprising that not one of the different procedures used for judicial disciplinary proceedings in the 50 states, including all that use the Attorney General for various functions, has ever been struck down as unconstitutional on due process grounds.
The majority regards Special Counsel Don Campbell as an “attaché” or “functionary” of the Attorney General based on (1) the title “special deputy attorney general” given to Campbell after he agreed to serve on the case and (2) the March 25, 1993, contract between the State of Nevada, acting by and through the Attorney General, and Donald J. Campbell & Associates. The conclusion drawn by the majority is that Campbell’s position is indistinguishable from that of a full-time salaried employee of the Office of the Attorney General. This conclusion elevates form over substance. The contract with Campbell is clearly a form contract used in any case requiring appointment of special counsel under the terms of NRS 41.03435. The majority in Whitehead II stated that “[t]his court will recognize a document for what it is, rather than the name associated with it.” Whitehead v. Comm’n on Jud. Discipline, 110 Nev. 380, 404, 873 P.2d 946, 961 (1994). Following this wisdom, it is clear that the form contract tells little, if anything, about the role that Campbell played in this case. It represents the type of bureaucratic obstacle that anyone from the private sector serving the state must sign in order to collect the modest financial remuneration which is allowed for such service.
The substance of special counsel Campbell’s service is set *923 forth in uncontradicted affidavits in the record. As a former state and federal prosecutor, he had substantial knowledge of and experience with proper investigatory and prosecutorial procedures. He discharged his investigatory duties personally, without relying on the use of agents and without sharing any factual findings with the Attorney General or any member of her staif. While a few conversations took place between Campbell and Assistant Attorney General Brooke Nielsen, all were of an administrative nature, primarily concerning the details of the procedures by which Campbell would be paid for his services. Campbell had long since left the public sector, had no prior connection with the Attorney General’s office and, since his appointment was for this one case only, he could anticipate having no future connection with the Attorney General’s office more substantial than that of any other attorney in private practice. After completing his investigation, Campbell reported his findings to the Judicial Discipline Commission and prepared to commence his prosecutorial responsibilities at the probable cause hearing scheduled by the Commission.
This sequence of events as set forth by the uncontradicted affidavits in the record illustrates the very type of separation of the investigatory and prosecutorial function from the adjudicatory and legal advisory ftmctions recommended in the Report and Recommendation to the ABA House of Delegates on the proposed changes to the American Bar Association’s Model Rules for Judicial Disciplinary Enforcement. The procedures followed by the Commission and its special counsel far exceeded the due process standards that have been set forth in both state and federal cases.
It should also be apparent that Campbell’s participation in these writ proceedings against the Commission is not only reasonable but mandatory, considering that so many of petitioner’s allegations of impropriety focus on Campbell’s actions. The majority states that, “Although the Attorney General and the Commission have continued to assert that Special Deputy Attorney General Don Campbell was not and is not acting on behalf of, or in concert with, the Attorney General’s office, we put that contention to rest in Whitehead II . . . .” In so stating, the majority implies that this court has already determined that Special Counsel Campbell is nothing more than an agent or attaché of the Attorney General and that consequently, whatever responsibilities Campbell undertakes are responsibilities undertaken by the Attorney General. The majority mischaracterizes Whitehead II.
The majority in Whitehead II simply addressed respondent’s contention that “the decision to employ and the selection of *924 Special Counsel Donald J. Campbell was made solely by the Commission, not by the Attorney General.” Whitehead II, 110 Nev. at 391, 873 P.2d at 953. The Whitehead II majority pointed out the various ways in which it believed that the Attorney General to have acted in concert with Campbell; however, it never addressed whether the Attorney General’s office and Campbell performed the same functions in this case. In fact, the majority specifically stated that it would not “decide the extent to which the Attorney General and others under her direct control and supervision have also functioned in an investigatory and prosecutorial capacity.” Id. at 386 n.2, 873 P.2d at 950 n.2. The majority further stated, “We may have occasion to address this subject further at a later date in the course of disposing of other pending motions.” Id. at 394, 873 P.2d at 955.
Given these statements and the question presented and addressed in Whitehead II, it cannot be said that this court “put to rest” any contention other than the claim that the decision to employ and select Campbell was not made solely by the Commission.[3] Considering the uncontradicted affidavits, it is difficult to determine how the majority reaches its conclusion that the Attorney General’s office, as opposed to Special Counsel Campbell, is investigating and prosecuting in this case. Unfortunately, it is also a conclusion forming the edifice upon which much of the majority’s argument is built.

ATTORNEY MISCONDUCT

In his concurring opinion, Justice Springer also alleges that the Attorney General’s office should be disqualified from continuing to represent the Judicial Discipline Commission because of misconduct. Specifically, he alleges that the Attorney General has displayed such animus and antipathy toward the petitioner “that she has rendered herself and her office unsuitable and incapacitated to serve as a prosecutorial advocate in the judicial discipline case involving Judge Whitehead” and her “running comments on this case display a continuous effort to influence public opinion against Judge Whitehead.” These allegations are unsupported by any competent evidence in the record. Counsel for the Petitioner have made these allegations, but there are no affidavits or competent evidence on which this court can, consistent with due process, condemn and sanction an attorney. This is particularly *925 inappropriate when the client Commission is also, in effect, being sanctioned.
Furthermore, Justice Springer quotes a very small portion of ARJD 8. He neglects to point out that ARJD 8 also states:
In any case in which the subject matter becomes public, through independent sources, or upon a finding of probable cause and filing of a formal statement of charges, the commission may issue statements as it deems appropriate in order to confirm the pendency of the investigation, to clarify the procedural aspects of the disciplinary proceedings, to explain the right of the respondent to a fair hearing without prejudgment, and to state that the respondent denies the allegations.
The documents in the file indicating public comments, although not authenticated or properly considered as evidence, may well conform to the part of Rule 8 quoted above. Certainly, any decision on whether Rule 8 was violated should be determined after presentation of proper evidence and an opportunity to controvert the evidence. It should also be noted that any public comments alleged to have been made by the Attorney General were made after Petitioner had waived any right to confidentiality and after he and his attorneys had apparently made extensive comments to the media.
Justice Springer seems to hold it as self-evident that adverse public comment about Petitioner automatically equates with violation of the Petitioner’s due process rights. It should be apparent that such a concept has never been the law. We would have very few criminal prosecutions if that were the case.
Justice Springer quotes Collier v. Legakes for the proposition that in exercising its discretion to disqualify a prosecutor the court “should consider all the facts and circumstances and determine whether the prosecutorial function could be carried out impartially. . . .” 98 Nev. 307, 309-10, 646 P.2d 1219, 1220 (1982). Justice Springer chooses to ignore the uncontradicted evidence that the Attorney General has not been acting as prosecutor. The uncontradicted evidence establishes that Special Counsel Don Campbell has been performing the prosecutorial function. There is not one iota of evidence that Campbell could not carry out his functions impartially or that he has engaged in any misconduct.
I agree that some violations of the rules could amount to a denial of due process, but whether due process has been provided is inherently fact-bound and requires only “such procedural protections as the particular situation demands.” Morrissey v. Brewer, 408 U.S. 471, 481 (1972). Pre-hearing publicity can *926 only be of constitutional dimension if it deprives the petitioner of his due process right to an unbiased decision-maker. Thus any public comments of the Attorney General would be relevant to any constitutional inquiry only if her remarks can be assumed to be of such great influence on members of the Judicial Discipline Commission so as to render the Commissioners incapable of deciding the case on the basis of the evidence at the contested hearing. Nothing in the record so suggests.
Aside from the lack of evidence that the Commission members are particularly impressionable individuals, none of the remarks even alleged to be made by the Attorney General discuss the factual allegations against the Petitioner, which would be the subject of the Commission’s inquiry. The discussions relate to the proceedings before this court, not proceedings before the Commission to which ARJD 8 refers. The “presumption of honesty and integrity in those serving as adjudicators,” simply cannot be rebutted on such an insubstantial basis. See Withrow, 721 U.S. at 47.
This proceeding has been extraordinary in a number of respects, not the least of which has been the incredibly hostile tone of the pleadings. Unfortunately, the majority of this court has adopted a similar hostility toward the Nevada Judicial Discipline Commission and its counsel. This is unjustified, considering that the case involves complex legal issues, many of constitutional dimension and many of first impression. Many issues are ones over which competent and ethical attorneys and judges can legitimately disagree. Yet, this court has treated good faith disagreements with the opinions of the majority as not just ridiculous, but evilly motivated. Even attorneys whose legal reasoning is incorrect deserve to be treated with courtesy and respect, not sarcasm and vilification. We should encourage healthy, open debate on legal issues, not stifle it.
The Commission’s attorneys have been especially attacked. I do not recall seeing a case in which actions of the litigant have all been attributed to the attorney without any evidence that such attribution is warranted. This seems totally unjustified in any case, but especially here where the affidavits of the individual members of the Commission refute the attribution. The members of the Judicial Discipline Commission, judges, attorneys, and non-attorneys alike — are caricatured as spineless sycophants at the tender mercies of tyrannical attorneys run amok. It is a tragedy that respected and respectable public servants who have generously given of their time, energy and abilities should be so denigrated.
The majority of this court has presumed that it has heard the *927 conversations between the attorneys and their client, and have, in effect, accused the attorneys of:
1. Counseling “acts of resistance” (Whitehead I, 110 Nev. 128, 141, 869 P.2d 795, 803 (1994));
2. Making “extended effort to establish grounds for charges against petitioner Whitehead, and to find witnesses to support them . . . {Whitehead I, 110 Nev. at 147, 869 P.2d at 807);
3. Not reading “our Goldman opinion with adequate care.” (Whitehead 1, 110 Nev. at 148, 869 P.2d at 807);
4. Using a special prosecutor as an attaché and special deputy attorney general “to help [her] pursue ends that [she] may have desired to see realized.” (Whitehead I, 110 Nev. at 148, 869 P.2d at 807);
5. Not relying “on evidentiary data compiled by original complaints,” but rather on “grievances he searched out himself.” (Whitehead I, 110 Nev. at 148 n.16, 869 P.2d at 808 n.16);
6. Counseling the Commission members “to place themselves in jeopardy of sanctions for contempt.” (Whitehead I, 110 Nev. at 149, 869 P.2d at 808);
7. Counseling the Commission to proceed “in direct violation of the current procedural rules or ARJD.” (Whitehead I, 110 Nev. at 162, 869 P.2d at 816);
8. “Contumaciously” withholding documents. (Whitehead II, 110 Nev. 380, 387, 873 P.2d 946, 951 (1994));
9. Violating “constitutional principles and court rules.” (Whitehead II, 110 Nev. at 387, 873 P.2d at 951);
10. Engaging in “exaggerated and hysterical rhetoric as merely a transparent attempt to attract media attention and inflame public passion.” (Whitehead II, 110 Nev. at 390, 873 P.2d at 953);
11. Improperly undertaking commitments “in violation of the ARJD.” (Whitehead II, 110 Nev. at 397, 873 P.2d at 957);
12. Demonstrating “inordinate and unexpected sensitivity _” (Whitehead II, 110 Nev. at 396, 873 P.2d at 956);
13. Attempting “to mislead this court into believing that our intervention in this proceeding is premature . . . .” {Whitehead II, 110 Nev. at 401, 873 P.2d at 959);
14. “[P]ublicly attempting to arrogate to the Commission a preeminent right of judicial review . . . .” (Whitehead II, 110 Nev. at 409, 873 P.2d at 964);
15. “[T]ried to capitalize on contrived ‘leaks’ to the media (hopefully engineered by others) by basing efforts to *928 disqualify justices upon inaccurate ‘leaked’ material.” ('Whitehead II, 110 Nev. at 416-417 n.33, 873 P.2d at 969 n.33);
16. Having “not only engaged in conduct that is not in accord with the ARJD, but, as mentioned, have made false statements of fact and law to the tribunal, SCR 172, and have unlawfully obstructed Judge Whitehead’s access to evidence, SCR 173.” (Whitehead II, 110 Nev. at 416-417 n.33, 873 P.2d at 969 n.33);
17. Having “sought to influence this tribunal by false, abusive statements to the media and other means possibly prohibited by law, SCR 14 . . . .” (Whitehead II, 110 Nev. at 416-417 n.33, 873 P.2d at 969 n.33);
18. “[IJnciting a circus-like atmosphere . . . .” (Whitehead II, 110 Nev. at 416-417 n.33, 873 P.2d at 969 n.33);
19. Making untrue “representations about the Commission’s prior position” which were “manufactured for the purpose of persuading someone other than the Justices of this court.” (Whitehead II, 110 Nev. at 406-407 n.23, 873 P.2d at 963 n.23).
The majority of this court is willing to presume not only what Commission counsel has advised, but to ascribe unflattering motivations for their actions without one bit of evidence supporting these presumptions and ascriptions. On the contrary, in some cases there is uncontradicted evidence denying the presumptions. Furthermore, the majority has adopted a hostile and sarcastic tone and characterization regarding legal arguments which competent and honorable attorneys can legitimately espouse. Furthermore, we should bear in mind that the opinions of this court are the law of this state, not necessarily because they are legally sound, but because this court is the court of last resort in this state.
I believe this hostile atmosphere has infected the proceeding and the decision to disqualify present Commission counsel. There are other forums appropriate for the determination of whether counsel have behaved appropriately. These forums provide procedures which recognize the attorney’s due process rights, and where sanctions must be based on evidence, not assumptions.
The rhetoric by all parties involved in this case, as well as by the media, leaves much to be desired, but it is totally unfair to single out the counsel for the Commission. Aside from my contention that it is legally wrong, it is also unfair to deprive the Commission of its experienced counsel in the middle of a proceeding. It continues and lengthens the paralysis of the *929 constitutionally-created system of judicial discipline in this state. The citizens of this state deserve better.
Of course, the Commission will be free to hire another prosecutor and another legal advisor, but considerable delay is inevitable. Furthermore, if a former prosecutor like Donald Campbell can take time away from his private law practice to make his investigatory and prosecutorial skills available to the public, then proceed to follow the rules of law, procedure and ethics to the best of his ability, only to be unceremoniously dismissed, surrounded by insinuations by his state’s highest court that he is a ruthless political hit man of a public official he had never met prior to this case, one can be certain that his successor will have to be a very brave individual indeed. Much the same could be said for the next legal advisor to the Commission.

APPOINTMENT OF MASTER

There is no dispute that a breach of a duty to maintain confidentiality can and should be sanctioned in an appropriate tribunal. I do not agree that this court should appoint a master to investigate the source of information reported in the media without serious consideration of the ramifications of such an investigation and without setting forth specific guidelines. This is a very sensitive area in which Supreme Court Rules regarding confidentiality are likely to come into conflict with First Amendment rights under the constitution of the United States and with provisions of the constitution and statutes of the State of Nevada. Justice Springer apparently believes that there are no legal concerns in such an investigation. He ignores the fact that the member of the media who was given the information is the one person (other than the perpetrator) who knows who provided it and that this person is protected from revealing his source by NRS 49.275. Justice Springer is further assuming (with no justification whatsoever) that the source is a member of Judicial Discipline Commission. Furthermore, recent events lead to the strong inference that the breach of confidentiality occurred within this court. This court should check its own personnel and procedures before casting aspersions on others.

CONCLUSION

I still protest the piecemeal handling of this case. All of the issues should be resolved in one opinion as soon as possible. The rights of the citizens of this state, as well as those of Petitioner, are at stake.
For the reasons discussed above, I would deny the motion to *930 preclude further involvement of the Attorney General and I would defer decision on the appointment of a master.

 This court held in Goldman that it would not undertake de novo — or independent — review of Commission decisions. 108 Nev. at 267, 830 P.2d at 117-18. In this respect, we adopted the same deferential type of review that we accord other agencies.
It is true that the prosecutor before the Commission, like the prosecutor before the Board of Medical Examiners (the Board), bears a higher burden than prosecutors in most agency determinations. In most agency determinations the burden below is substantial evidence. See NRS 233B.135. In professional discipline cases, on the other hand, the burden imposed below is higher, and we review those cases to determine whether the evidence presented at the hearing was sufficient to establish, by clear and convincing evidence, that the alleged violations had been proven. See Goldman, 108 Nev. at 264, 830 P.2d at 115 (stating that burden of proof before commission is clear and convincing evidence); see also NRS 630.352(1) (requiring the Board to find violations by clear and convincing evidence before sanctioning a health provider).
Although we review the determinations of the Board and the Commission in accordance with the higher standards imposed on them by law and court rule, the fact that we do not engage in independent review is evidence that our review is deferential.

 This assumption is contradicted by the respondents’ affidavits.

 I will accept this for the sake of argument even though I conclude that the record does not support it. The uncontradicted affidavits indicated that although the Attorney General’s office assisted in finding an attorney and in implementing the procedural details of hiring, the Commission alone made the decision to hire Campbell.